IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

JEFF P. LIMBERG,

     Plaintiff,

        v.

KILOLO KIJAKAZI,
Acting Commissioner of Social Security,[1]

     Defendant.

OPINION AND ORDER

21-cv-189-bbc

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Plaintiff Jeff P. Limberg appeals a decision of the Acting Commissioner of Social Security denying plaintiff's application for disability insurance benefits and supplemental security income under the Social Security Act. He asks the court to remand his case to the agency for new proceedings on the ground that the administrative law judge (ALJ) who heard his case made errors of law and reached a decision unsupported by substantial evidence when he determined that plaintiff could perform a limited range of light work. Alternatively, he asks for a remand under sentence six of 42 U.S.C. § 405(g) so that the agency may reconsider his claim in light of new and material evidence. For the reasons set out below, I find plaintiff's arguments unconvincing and will affirm the decision of the acting commissioner.

---

[1]Kilolo Kijakazi became the Acting Commissioner of Social Security on July 9, 2021, replacing the former commissioner, Andrew Saul.

1

The following facts are drawn from the Administrative Record (AR).

## FACTS

### I. Medical Evidence

Plaintiff applied for disability insurance benefits and supplemental security income under the Social Security Act on July 11, 2019. He alleged that he had been disabled since August 14, 2018, when he was 46 years old, as a result of "severe" back problems as well as a number of mental impairments. (In this appeal, he focuses only on his physical impairments, so I have done the same.)

Prior to his alleged onset date, plaintiff had two lumbar fusion surgeries, performed by Dr. Jonathan Pond. Although subsequent x-rays and MRI scans have shown his fusion (from L2-L5) is stable and he has only mild degenerative changes at other levels in his spine, plaintiff continues to report chronic back pain that radiates into his legs at times. His doctors have diagnosed post-laminectomy syndrome, also known as failed back surgery syndrome, which is a term used to describe spinal pain of unknown origin that persists despite surgical intervention. www.ncbi.nlm.nih.gov/pmc/articles/PMC5106227 (visited Feb. 1, 2022). To alleviate his pain, plaintiff takes Lyrica, baclofen (a muscle relaxer), gabapentin (an anticonvulsant often used to treat pain from nerve damage), and hydrocodone (an opioid), which he takes only sparingly, about 2-3 pills a week. He also takes a number of prescribed medications to treat his mental impairments.

In October 2019, plaintiff saw Dr. Pond for back pain and intermittent burning in his feet.  AR 792-795.  From his examination of plaintiff, Dr. Pond found "no worrisome neurological weakness," noting that plaintiff  was able to heel and toe walk and squat, and had a slow but normal gait, full strength in his lower extremities, and negative straight leg raise test.  Dr. Pond recommended that plaintiff limit his activities to lifting 20 pounds and avoiding repetitive bending and twisting.

Plaintiff saw Dr. Pond again on February 10, 2020, stating that he continued to have back pain and wanted surgery to correct it.  Plaintiff reported a progressive decline in his ability to walk, with frequent falls, and difficulty with fine motor activities in his hands.  AR 810.  On examination, Dr. Pond observed that plaintiff had a "very abnormal gait pattern," noting that he took short strides and moved spastically.  Plaintiff also had a difficult time with fine motor tasks such as rapid alternating movements, picking up small objects, and buttoning.  Plaintiff said he had had these symptoms for awhile but they had become much worse over the last couple of months.  AR 813.  From his exam and the history provided by plaintiff, Dr. Pond suspected that he might have an upper motor neuron lesion.  He referred plaintiff to a neurologist.

On March 9, 2020, plaintiff was seen by neurologist Paul Tuttle, M.D., to evaluate his complaints of trouble with walking, tripping, poor balance, and weakness in his legs.  AR 1052-56.  Plaintiff said he had had these problems, on and off, for the past three to four years.  Dr. Tuttle reviewed plaintiff's medical history, including MRI scans of his brain, cervical spine, and lumbar spine, and conducted an exam. Dr. Tuttle observed that plaintiff

appeared "quite sedated" during the exam, even appearing to fall asleep while lying on his back during reflex testing.  Observing plaintiff's gait and station, Dr. Tuttle observed that plaintiff initially walked slowly and cautiously, taking small steps and intermittently scuffing his feet, but when he was asked to turn around and come back to the exam room, he stepped out with a normal stride and virtually normal gait for several steps.  After completing the exam, Dr. Tuttle concluded that plaintiff's lethargy and imbalance were likely the result of overmedication.  Dr. Tuttle noted that the "only finding on neurological examination of note" was that plaintiff had high arched feet and hammer toes, which suggested that he might have a neuropathy.  Even so, wrote Dr. Tuttle, any neuropathy would not be "a significant contributing factor to his current clinical presentation."  AR 1056.

On May 15, 2020, plaintiff underwent an EMG study which confirmed that he had a "sensory-motor polyneuropathy affecting both lower extremities," with loss of nerve supply largely limited to the intrinsic foot muscles.  The report noted that the neuropathy was most likely a hereditary condition.  AR 972.

On May 18, 2020, plaintiff called Dr. Tuttle's office, asking for a work excuse from February until "now or when you believe he can return to work."  Dr. Tuttle responded that even though the EMG showed evidence of neuropathy, that was not the cause of plaintiff's balance problems.  Dr. Tuttle reiterated his belief that plaintiff was overmedicated, stating that "from a neurological standpoint he can return to work."  AR 1005.

On June 26, 2020, plaintiff saw Dr. Carmela Gonzales in follow up in the neurology clinic, reporting continued balance problems and pain.  AR 889.  Dr. Gonzales noted that

plaintiff walked with a normal base, but dragged his left foot and had decreased arm swing. She noted that plaintiff had polyneuropathy that was likely hereditary, but that he was "also on multiple sedating and anticholinergic medications that is also likely affecting his gait." AR 893. She referred plaintiff to physical therapy for gait and balance training.

On June 29, 2020, plaintiff saw Dr. Pond for evaluation of his continued back pain. AR 887-889. Dr. Pond found once again that plaintiff had normal strength in his lower extremities. The doctor also observed that plaintiff mobilized well from a chair to a stand, had a normal gait pattern, and his most recent MRI showed a solid fusion from L2 to the sacrum, with only mild degenerative changes at L1-L2. Dr. Pond found nothing to suggest that further surgery was an option, explaining that it was not surprising that plaintiff had continued pain given his history of a 3-level fusion. Dr. Pond and plaintiff discussed a number of pain management options, including a spinal cord stimulator, which plaintiff said he would like to pursue. (A spinal cord stimulator is an implanted device that sends low levels of electricity directly to the spinal cord to relieve pain. https://www.hopkinsmedicine.org/health/treatment-tests-and-therapies/treating-pain-with-spinal-cord-stimulators (Feb. 1, 2022).)

Dr. Pond referred plaintiff to Dr. James Nicholson, who found him to be an acceptable candidate for a spinal cord stimulator. AR 881-82. However, the record does not indicate that plaintiff ever followed up with Dr. Nicholson or had a stimulator implanted.

On July 14, 2020, plaintiff saw his primary care provider. Dr. Kari Vrzal, reporting frequent falls caused by back pain and leg weakness. Plaintiff said lying down flat helped the

5

most, while standing or walking made it worse.  Plaintiff had recently begun a course of physical therapy. Dr. Vrzal described plaintiff's falls as "due to neuropathy, multifactoral" and noted that plaintiff was waiting to consult with a geneticist.  AR 876.

Plaintiff attended 10 physical therapy sessions for gait and balance training in July and August 2020.  AR 859– 872.  Plaintiff brought a cane that he had purchased online, and the therapist worked with him on using it.  The records indicate that plaintiff reported falling a number of times when he was not using it, including when he was getting into the bathtub or into a car.  Although the therapist advised plaintiff to use the cane, he noted on August 3 that plaintiff had limited compliance.  At a visit on July 22, plaintiff reported limited compliance with his home exercise program because he had been "busy." AR 872.

## II. Medical Opinions

### A. State Agency Physicians, Dr. Young and Dr. Madera

Dr. Marc Young, a consultant for the local disability agency, reviewed plaintiff's claim on October 7, 2019. After reviewing plaintiff's medical records, Dr. Young's opinion was that plaintiff could perform light work with a number of postural limitations.  Dr. Young noted plaintiff's reports of unsteadiness and frequent falls, as well as records noting that plaintiff had a slow, mildly-antalgic gait, but also noted that at other visits, plaintiff was found to have a normal gait and station and full, symmetric strength in his lower extremities. Dr. Young further observed that plaintiff was working part-time, just below substantial gainful activity level, and that he had gone on a wedding cruise in August 2019.  AR 296.

On reconsideration, state agency physician Marta Madera, M.D., reviewed plaintiff's updated medical records and found no reason to disagree with Dr. Young's conclusions about plaintiff's limitations.  Dr. Madera noted that plaintiff did not allege any worsening of his condition, his x-rays showed a stable fusion from L2-L5 with only mild degenerative changes at other levels, and on October 30, 2019, Dr. Pond had found he had no significant neurologic weakness or numbness.  In fact, as Dr. Madera noted, Dr. Pond had recommended that plaintiff lift no more than 20 pounds and avoid repetitive bending and twisting activities.  AR 332-33.  Dr. Madera issued her report on January 24, 2020.

## B.  Dr. Pond

After evaluating plaintiff on February 10, 2020, Dr. Pond wrote a "To Whom It May Concern" letter, stating that he was supportive of plaintiff's claim for disability based on the combination of poor fine motor control in his hands and inability to safely walk.  AR 844. Dr. Pond noted that plaintiff had evidence of an "unknown upper motor neuron condition" for which he was being evaluated by neurology.  Id.

On August 10, 2020, Dr. Pond completed a "Statement of Capacities" questionnaire for plaintiff.  AR 848.  Dr. Pond indicated that plaintiff could lift and carry no more than five pounds, could stand and walk for at most two hours during an eight-hour day, and could sit at most six hours in an eight-hour day.  Also, in contrast to his February 10 statement, Dr. Pond found that plaintiff had no limitation on his ability to use his hands.  Dr. Pond

further indicated that plaintiff should not bend or twist and should be allowed to sit or stand as needed.  Dr. Pond attributed these limitations to plaintiff's spinal fusion.

## C. Dr. Vrzal

In June 2020, plaintiff's treating physician, Dr. Kari Stauffer Vrzal, filled out FMLA paperwork in which she wrote that plaintiff was incapacitated.  AR 834-37.  On August 14, 2020, she wrote a "To Whom It May Concern" letter stating that plaintiff needed to use a cane "due to medical reasons."  AR 850.

## III.  Administrative Hearing

After plaintiff's claims were denied initially and on reconsideration, he was granted a hearing, which was held on August 25, 2020.  ALJ Timothy Malloy presided and plaintiff was represented by counsel.  Plaintiff testified at the hearing that he had last worked in July 2019, when he was employed half-time assembling cardboard boxes at 3 Sheeps craft brewery.  AR 126-28, 131.  He had worked previously in packaging for other companies, lifting 40-50 pounds, but had stopped doing so after having two back surgeries.  AR 129. He testified that he suffered from a variety of physical problems, including low back pain, loss of balance, and a possible motor neuron condition, and he fell frequently.  Plaintiff said he could no longer work at 3 Sheeps because he has to use a cane at all times and the company told him he could not work there with it.  AR 132.

At the hearing, the ALJ asked plaintiff about Dr. Tuttle's impression that overmedication was causing his frequent falls and whether any of his prescribing physicians had changed his medications as a result of Dr. Tuttle's note.   AR 135.   Plaintiff acknowledged that he was "very well medicated due to attempted suicide."  Id.  He said he was going to the pain management clinic over the weekend "and we're gong to be talking about it again," and that he was also going to discuss medications when he saw his psychiatrist in September.  AR 136.  Plaintiff said his memory was "very, very bad" with respect to his medications and his wife had to keep track of everything for him.  Id.

As for his daily activities, plaintiff testified that he could go up and down stairs to his second floor apartment, but generally spent the day lying down, taking his pain medication, and not doing any chores.  AR 139-140.  He said he could not drive because of his constant falls, his many episodes of shaking, and the constant pain in his back.  AR 142.  Plaintiff also said that he was applying for benefits because of his bad memory, many episodes of shaking, falls resulting in broken ribs, and a constant pain in his back.  AR 142.

In response to a hypothetical by the ALJ, a vocational expert testified that an individual who required a cane to ambulate would not be able to perform any jobs at the light level of exertion, and a person who required a cane for standing and balance would not be able to perform any jobs at the sedentary level.  AR 161-62.

IV.   <u>ALJ Decision</u>

Following plaintiff's hearing, the ALJ issued his decision, finding plaintiff not disabled

according to the five-step inquiry for evaluating claims such as his.  20 C.F.R. §§ 404.1520,

416.920.  At step one, the ALJ found that plaintiff met the insured status requirement of the

Social Security Act through March 31, 2023 and that, although he had done some part-time

work after his alleged onset date, his earnings from that work did not amount to substantial

gainful activity.  AR 91.  At steps two and three, the ALJ found that plaintiff had four severe

impairments: (1) degenerative disk disease; (2) peripheral neuropathy; (3) anxiety disorder;

and (4) depressive disorder, but none was "of a severity to meet or medically equal the

severity of one of the listed impairments  in 20 C.F.R. Pt. 404, Subpt. P, App. 1."  <u>Id</u>.

Next, the ALJ determined that plaintiff had the residual functional capacity to

perform light work, meaning that he could stand or walk up to six hours, except that he

would be limited in the amount of stair climbing, balancing, stooping, crouching, kneeling,

and crawling he could do.  AR 95.  The ALJ also found that plaintiff was limited to unskilled

work performing simple, routine, repetitive tasks that could be performed at a flexible pace,

and which required only occasional interaction with the public and coworkers.  <u>Id</u>.

In reaching these conclusions, the ALJ found that plaintiff's medically determinable

impairments could reasonably be expected to cause his alleged symptoms but his statements

about the intensity, persistence, and limiting effect of those symptoms were "not entirely

consistent with the medical evidence and other evidence in the record. " AR 96.  As the ALJ

explained, the objective medical evidence showed that neither plaintiff's degenerative disc

10

disease nor his peripheral neuropathy was as severe as he alleged, given the mild findings on his spinal imaging and his generally normal examination findings.  AR 97.  The ALJ noted plaintiff's ability to walk with a normal gait, his ability to walk on his heels and toes, his full strength, normal muscle tone, normal reflexes and coordination, and negative straight leg raising tests.  Acknowledging that plaintiff had testified that he had many functional limitations, the ALJ noted that he nevertheless was able to complete many activities of daily living, such as driving short distances and going up and down the stairs to his second story apartment two to four times day.  AR 96.  In addition, in 2019 and 2020, he had performed significant part-time work for his employer, 3 Sheeps.  Finally, the ALJ noted that plaintiff's wife had filled out a third party function report in which she said that plaintiff shopped in stores, fixed simple meals, attended church regularly, and handled his own personal care and money.  Id.

The ALJ also considered plaintiff's course of treatment, finding that it had been "conservative and effective."  AR 103.  The ALJ noted that plaintiff reported using his narcotic medication only sparingly and that it had provided good relief; Dr. Pond had found no need for additional surgery; there was no evidence that plaintiff had pursued a spinal cord stimulator even after he was found to be a good candidate for one; plaintiff's ongoing difficulties with walking and balance were attributed to overmedication, yet plaintiff continued to take sedating medication; and plaintiff reported in July 2020 that he was non-compliant with his home exercises due to "being busy."  AR 103.

The ALJ considered plaintiff's use of a cane, but found that a limitation requiring its use was not necessary.  The ALJ noted that plaintiff had purchased the cane on his own and although Dr. Vrzal had said a cane was necessary for "medical reasons," she did not specify what reasons.  AR 109.  In addition, the ALJ found her opinion was not supported by her treatment notes, which showed that plaintiff had generally normal physical examinations, or with Dr. Tuttle's conclusion that plaintiff's reported gait and balance problems were not caused by any neurological defect but rather were due to overmedication.  Id.  The ALJ noted that although Dr. Tuttle had encouraged plaintiff to address his medications, he remained on multiple sedating medications three months later at a follow up neurology appointment.  AR 106.  The ALJ also noted that plaintiff had not been using a cane at an appointment in May 2020, and his physical therapist later reported on a number of occasions that plaintiff was not compliant with his cane.

Finally, at step five, the ALJ found that given his residual functional capacity, plaintiff could perform the requirements of representative jobs identified by the vocational expert who had testified at the administrative hearing in response to a hypothetical incorporating the limitations found by the ALJ.  These jobs were merchandise marker, housekeeper and cafeteria attendant.  Id.  Because these jobs existed in significant numbers in the national economy, the ALJ found plaintiff was not disabled.

12

V.  Appeals Council

After the ALJ issued his decision, plaintiff asked the Appeals Council to review his claim.  In support, he submitted 70 pages of additional medical records, including a November 9, 2020 consult with neurologist Jafilan Salem, M.D.  AR 24-27.  Dr. Salem found that plaintiff had reduced or absent sensation to pinprick at the toes, ankles, and upward to the thighs, as well as in the hands up to the forearms.  He observed that plaintiff had a cautious gait with foot dragging on the left greater than right, was unable to toe walk or perform tandem gait, and had some difficulty with heel walking.  After examining plaintiff and reviewing his medical and family history, Dr. Salem concluded that plaintiff most likely had Charcot-Marie-Tooth disease, a slowly progressive, hereditary disorder that causes nerve damage, mostly in the arms and legs.  See https://www.mayoclinic.org/diseases-conditions/charcot-marie-tooth-disease/symptoms-causes/syc-20350517 (Feb. 2, 2022).  However, Dr. Salem did not offer any opinions about plaintiff's limitations, need for a cane, or the degree to which overmedication was affecting his gait and balance.

The Appeals Council summarily denied plaintiff's application for review, stating that the additional evidence "does not show a reasonable probability that it would change the outcome of the decision."  AR 11.  Plaintiff then filed the instant action for judicial review under 42 U.S.C. § 405(g).

13

OPINION

In deciding whether plaintiff should prevail on his claim for benefits, the question for the court is not whether it would reach the same decision the ALJ did, but whether the ALJ's decision is supported by "sufficient evidence to support the agency's factual determinations." Biestek v. Berryhill, 139 S. Ct. 1148, 1154 (2019).  Stated differently, this court must determine whether the ALJ's findings are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Id.  In addition, the ALJ must identify the evidence and build a "logical bridge" between that evidence and the ultimate determination.  Moon v. Colvin, 763 F.3d 718, 721 (7th Cir. 2014).

Plaintiff argues broadly that the ALJ's decision contains errors of law and is not supported by substantial evidence.  More specifically, he argues that remand is required because the ALJ:  (1) erred in finding that plaintiff did not require the use of a cane; (2) misconstrued the evidence in refusing to fully credit plaintiff's subjective symptoms of pain; and (3) erred in evaluating the opinion evidence.  Alternatively, he asks this court to remand the case for consideration of the evidence that he submitted to the Appeals Council, which plaintiff maintains is new and material to the ALJ's determination.

## I.  Frequent Falls/Need for a Cane

A cane must be incorporated in an RFC if it is a medical necessity. Tripp v. Astrue, 489 F. App'x 951, 955 (7th Cir. 2012).  For a cane to be medically necessary, there must be "medical documentation establishing the need for [the cane] to aid in walking or standing,

and describing the circumstances for which it is needed." See SSR 96-9p, 1996 WL 374185, at *7 (S.S.A. July 2, 1996).  The Seventh Circuit has suggested that a finding of medical necessity requires an "unambiguous opinion from a physician stating the circumstances in which an assistive device is medically necessary." Id. (citing Spaulding v. Astrue, 379 F. App'x 776, 780 (10th Cir. 2010) (non-precedential decision) (provision of cane to claimant by VA medical service at physician's request did not satisfy medical necessity standard); Staples v. Astrue, 329 F. App'x 189, 191–92 (10th Cir. 2009) (non-precedential decision) (doctor's statement that claimant "uses a cane to walk" did not establish medical necessity); Howze v. Barnhart, 53 F. App'x 218, 222 (3d Cir. 2002) (doctor's reference to "script" for cane and checking box on printed form corresponding to statement that "hand-held assistive device medically required for ambulation" was insufficient to establish medical necessity)). The mere fact that the claimant has been seen or reported to be using an assistive device is not sufficient.  Id. Even a physician's statement that a claimant "needs" such a device may not establish medical necessity if it is unclear whether the doctor is offering a medical opinion or merely restating what the claimant told him. Id.

The ALJ rejected plaintiff's contention that the RFC include an assistive device limitation, for the following reasons:  (1) throughout most of the record, plaintiff had generally normal physical examination findings and remained ambulatory with a normal gait; (2) Dr. Tuttle, the neurologist who evaluated plaintiff in March 2020 for his reported imbalance and gait problems, found no neurological reason for his gait problems but instead found that plaintiff was overmedicated; (3) plaintiff continued taking multiple sedating

medications even after his appointment with Dr. Tuttle; (4) at a May 2020 appointment, plaintiff denied using an assistive device to ambulate and there is no evidence that he presented using a cane at any appointments except with his physical therapist; (5) in June 2020, Dr. Gonzales reaffirmed that plaintiff's medications were likely affecting his gait; (6) Dr. Pond observed in June 2020 that plaintiff mobilized well from a chair to a standing position and had a normal gait; (7) plaintiff purchased the cane himself; and (8) plaintiff's physical therapist noted in August 2020 that plaintiff was non-compliant with his cane.  The ALJ acknowledged that plaintiff's primary care physician, Dr. Vrzal, had drafted a letter indicating that the cane was "medically necessary," but he found it unpersuasive, explaining that her opinion was not supported by her treatment notes, was contradicted by Dr. Tuttle's conclusion that plaintiff's gait and balance problems were related to overmedication, and was vague, insofar as the doctor did not specify what medical reasons required a cane or when such usage was required.

Plaintiff contends that the ALJ placed too much weight on Dr. Tuttle's opinion that plaintiff's gait and balance issues were caused by the multiple medications he was taking rather than any neurological condition.  Plaintiff notes that Dr. Gonzales, also a neurologist, suggested that plaintiff's gait problems were likely the result of medication *and* a hereditary neurological condition.  In addition, he notes that the physical therapy records on which the ALJ relied indicated that plaintiff fell at times when he wasn't using the cane, which suggests that it was medically necessary, not the opposite.

Although plaintiff presents a plausible interpretation of the evidence, his arguments fail to show that remand is necessary.  At most, plaintiff shows that the record supports competing inferences about the reliability of his reported gait problems, their cause, and the degree to which a cane was medically necessary.  However, this court may not "reweigh evidence, resolve conflicts, decide questions of credibility, or substitute [its] judgment for that of the Commissioner." Burmester v. Berryhill, 920 F.3d 507, 510 (7th Cir. 2019) (quoting Lopez ex rel. Lopez v. Barnhart, 336 F.3d 535, 539 (7th Cir. 2003)).  Certainly, plaintiff has not identified an "unambiguous" medical opinion stating that plaintiff required a cane, much less the circumstances for its use.  As the ALJ correctly noted, Dr. Vrzal's opinion was vague on that point, not to mention unsupported by her treatment notes.  The ALJ reasonably rejected her opinion over that of the specialist, Dr. Tuttle, who explicitly rejected the idea that plaintiff's reported difficulties with gait and balance were the result of a neurological condition.  Moreover, the ALJ properly noted that plaintiff did not consistently demonstrate an abnormal gait at physical examinations; in fact, his gait was found to be normal at most examinations during the relevant time period, even at an examination by Dr. Pond in June 2020.  All of this evidence reasonably supports the ALJ's determination that a cane was not medically necessary.

Plaintiff argues that even if his gait and balance problems were the result of overmedication, that does not mean he did not need a cane.  Plaintiff notes that there is nothing to suggest that he was abusing his medications or not taking them as prescribed, and therefore the ALJ should have found that plaintiff's imbalance was a medication side effect

requiring use of the cane.  It is true that an ALJ must consider the side effects of plaintiff's medications in evaluating his ability to work.   20 C.F.R. §§ 404.1529(c)(3)(iv), 416.929(c)(3)(iv); <u>see also</u> SSR 16-3p, 2016 WL 1119029, at *7.  However, plaintiff's argument begins from the flawed assumption that the ALJ fully credited plaintiff's reports of frequent falls and gait instability but rejected that evidence solely on the ground that plaintiff was overmedicated.  As just discussed, Dr. Tuttle's conclusion that plaintiff's reported frequent falls and instability were the result of overmedication was only part of the reason the ALJ found the cane not medically necessary.  The ALJ also noted plaintiff's normal gait and stability throughout most of the record, including in June 2020 when plaintiff saw Dr. Pond, the fact that no doctor had prescribed the cane for him, his statement in May 2020 that he did not need an assistive device for ambulation, and his reported non-compliance as noted by the physical therapist.  Plaintiff's contention that the ALJ rejected the need for an assistive device limitation based solely on Dr. Tuttle's statement that plaintiff was overmedicated is not supported by the ALJ's decision.

In sum, the ALJ cited sound reasons, grounded by evidence in the record, for his determination that no assistive device limitation was necessary.  Accordingly, he did not err in failing to include such a limitation in plaintiff's RFC.

## II.  Subjective Symptom Evaluation

Apart from the need for a cane, plaintiff argues that the ALJ erred in rejecting his subjective complaints of pain in finding that he could perform a limited range of light work.

An ALJ must consider a claimant's subjective complaints of pain if the claimant has a medically determined impairment that could reasonably be expected to produce that pain. 20 C.F.R. § 404.1529(c)(1). As noted above, the ALJ found that plaintiff had such impairments, but that his subjective complaints were not supported by the objective medical evidence, plaintiff's activities, and his course of treatment.

Plaintiff raises a host of disagreements with the ALJ's credibility assessment, but none is persuasive. First, he suggests that the ALJ placed too much weight on plaintiff's largely normal physical examinations in light of his diagnosis of post-laminectomy syndrome. Plaintiff seems to suggest that this diagnosis confirms his reports of pain. However, the ALJ accepted that plaintiff had pain; he simply did not find that it was as severe or functionally limiting as plaintiff alleged. Plaintiff's diagnosis of post-laminectomy syndrome does not, in itself, undermine the ALJ's findings. Schmidt v. Barnhart, 395 F.3rd 737, 745-46 (7th Cir. 2005) (diagnosis alone does not establish the existence of a condition or its severity).

Plaintiff next suggests that in reviewing his medical record, the ALJ presented a one-sided view of the evidence that minimized plaintiff's symptoms and overstated the degree to which medication was helpful in reducing his pain. Br. in Supp., dkt. #18, at 8-9. It is well-settled, however, that an ALJ need not discuss each and every piece of evidence in the record, provided he does not ignore an "entire line" of evidence contrary to his ruling. Terry v. Astrue, 580 F.3d 471, 477 (7th Cir. 2009) (citing Villano v. Astrue, 556 F.3d 558, 563 (7th Cir. 2009)). Plaintiff does not identify such a "line" of evidence. In considering plaintiff's pain, the ALJ noted that plaintiff used narcotic pain medication only sparingly and

that when he did, he obtained significant pain relief, facts plaintiff virtually admits in his brief.  Plaintiff argues that it was unfair for the ALJ to rely on plaintiff's sparing use of hydrocodone while at the same time giving credence to reports in the record attributing plaintiff's gait and balance problems to overmedication.  Although this is a fair criticism, hydrocodone was only one of plaintiff's many medications, and there is nothing to suggest that that medication alone was the cause of plaintiff's reported gait problems.  I do not find the ALJ erred in finding that plaintiff's sparing use of narcotic pain medication was a factor tending to undermine his claim that his pain was disabling.

Next, plaintiff challenges the ALJ's evaluation of his daily activities, arguing that the ALJ "state[d] that Limberg's daily activities are consistent with light work."  Br. in Supp., dkt. #18, at 12.  That is not what the ALJ said.  The ALJ said that "[d]espite the claimant's alleged symptoms, he completes many activities of daily living."  AR 107. He went on to note that plaintiff could drive short distances and go up and down the stairs to his second story apartment.  AR 96.  In addition, the ALJ noted that plaintiff's wife had filled out a third party function report in which she said that plaintiff shopped in stores, fixed simple meals, attended church regularly, and handled his own personal care and money.  AR 558-65. It is true that the Seventh Circuit has warned ALJs not to equate sporadic activities of daily living with the demands of full time work, but I do not understand the ALJ to have done that here.   Instead, the ALJ merely pointed out that plaintiff's activities were inconsistent with his reports that his conditions prevented him from doing much besides lie down most of the day.  This was a proper use of this evidence.  Pepper v. Colvin, 712 F.3d

351, 369 (7th Cir. 2013) (ALJ relied properly on plaintiff's daily activities where level of exertion they required contrasted directly with plaintiff's own statements about her limitations).

Contrary to plaintiff's argument, the ALJ made similar use of the evidence concerning plaintiff's part-time work activity. As with daily activities, the Seventh Circuit has cautioned ALJs not to draw conclusions about a claimant's ability to work full time based on part-time employment. See Lanigan v. Berryhill, 865 F.3d 558, 565 (7th Cir. 2017) (claimant's ability to work part time not necessarily inconsistent with disability); Jelinek v. Astrue, 662 F.3d 805, 812 (7th Cir. 2011) (explaining that a claimant's "brief, part-time employment" did not support a conclusion "that she was able to work a full-time job, week in and week out, given her limitations"); Larson v. Astrue, 615 F.3d 744, 752 (7th Cir. 2010) ("There is a significant difference between being able to work a few hours a week and having the capacity to work full time."). However, the ALJ did not make that error in this case. Insofar as the ALJ referred to plaintiff's part-time employment throughout 2019 and much of 2020, it was to contrast it with plaintiff's testimony that he had last worked in July 2019 and that his pain prevented him from doing much besides lie down at home most of the day. See AR 107. Relying on plaintiff's work activities for this purpose was not improper. Berger v. Astrue, 516 F.3d 539, 546 (7th Cir. 2008) ("Although the diminished number of hours per week indicated that Berger was not at his best, the fact that he could perform some work cuts against his claim that he was totally disabled.").

Finally, plaintiff argues that the recommendation of some of his doctors to obtain a spinal cord stimulator corroborates his allegations of severe pain.  As the ALJ noted, however, it appears plaintiff never pursued this treatment option even though his doctors found him to be an appropriate candidate.  Citing Craft v. Astrue, 539 F.3d 668, 679 (7th Cir. 2008), plaintiff argues that the ALJ erred in drawing an adverse inference from his failure to obtain a stimulator because he never asked plaintiff at the hearing why he had not done so.  Id. (ALJ may not draw adverse inference about a claimant's condition from lack of medical care unless ALJ explores reasons for lack of care).  At the same time, however, plaintiff has not identified any specific reason he did not pursue this treatment option even though it was available to him.  I decline to order a remand absent reason to believe a second proceeding might come to a different result.  Accord Deborah M. v. Saul, 994 F.3d 785, 790 (7th Cir. 2021) ("[E]ven if the ALJ's consideration of Plaintiff's lack of treatment were wrong, Plaintiff has not shown that it caused any harm.").

In sum, I conclude that the ALJ's discussion of plaintiff's subjective symptoms is adequate and supports the decision that plaintiff is not disabled.


III.  Evaluation of Opinion Evidence

As plaintiff points out, the record contains a number of opinions from physicians who treated plaintiff, including his orthopedic surgeon, Dr. Pond, and his general physician, Dr. Vrzal, who suggested that plaintiff had more severe limitations than the ALJ found. Notably, Dr. Pond indicated that plaintiff required a five-pound lifting limitation and Dr.

Vrzal opined that plaintiff required a cane and could not return to work.  In addition, plaintiff's claim was reviewed by consulting physicians for the state disability agency, who offered opinions about plaintiff's work-related limitations.

Because plaintiff's claim was filed after March 27, 2017, the ALJ was required to consider these opinions in accordance with the commissioner's new rules for considering medical opinions, set forth at 20 C.F.R. §§ 404.1520c, 416.920c. Under these rules, the opinions of state agency physicians are considered "prior administrative medical findings" that the ALJ must consider, along with any other medical opinions, with no opinion entitled to any deference or specific evidentiary weight.  Id.  As under the prior rules, the ALJ is to consider a number of factors in evaluating each opinion's persuasiveness, including supportability, consistency, the provider's speciality and relationship with the claimant, with supportability and consistency being the most important.  Id.  Finally, although ALJs must discuss in their decisions how persuasive they find the various medical opinions and prior administrative medical findings, they need only explain how they considered the supportability and consistency factors; discussion of the other factors is optional except when two medical opinions are otherwise equally persuasive.  Id.

The ALJ discussed all of the medical opinions in detail in his decision.  AR 107-110. He concluded, ultimately, that the opinions from the state agency consultants were more persuasive than those of the treating physicians because they were well-supported by their review of plaintiff's medical records and most consistent with the record as a whole, noting

plaintiff's generally normal physical findings on examinations and the mild abnormalities detected on imaging and EMG studies.

Plaintiff argues primarily that the ALJ erred in relying on the state agency opinions because they were outdated in light of the May 2020 EMG study finding that he had a polyneuropathy affecting both lower extremities. Once again, plaintiff argues that the ALJ erred in downplaying the significance of this study by finding that plaintiff's gait and balance problems were the result of overmedication rather than a neurological condition. As noted previously, however, the ALJ did not draw this conclusion from whole cloth, but merely parroted the conclusion reached by Dr. Tuttle. Moreover, regardless of the EMG findings or the later suggestion by Dr. Gonzales that medication may be only part of the reason for plaintiff's reported falls, the fact remains that the record primarily shows that plaintiff had largely normal physical examinations, was treated conservatively, was able to complete many activities of daily living independently and worked part time. The ALJ reasonably relied on all of this evidence in giving more weight to the opinions of the state agency physicians.

## IV.  Request for Sentence Six Remand

Finally, plaintiff argues in the alternative that this court should remand his case for further consideration under sentence six of 42 U.S.C. § 405(g), which permits remand in situations where "there is new evidence which is material and . . . there is good cause for the failure to incorporate such evidence into the record in a prior proceeding." However, the so-called "new" evidence that plaintiff wants the agency to consider is the same evidence that

he presented to the Appeals Council.  A sentence six remand is not available in this situation. Stepp v. Colvin, 795 F.3d 711, 726 n.8 (7th Cir. 2015) ("evidence that has been submitted to and rejected by the Appeals Council does not qualify as 'new' within the meaning of § 405(g)")(citing Farrell v. Astrue, 692 F.3d 767, 770 (7th Cir. 2012)); DeGrazio v. Colvin, 558 Fed.Appx. 649, 652 (7th Cir. 2014) ("The evidence that the Commissioner characterized as 'new' in her motion—the audiometric report that confirmed DeGrazio's hearing loss—was not new for purposes of sentence six because it already had been presented to the Appeals Council.").

Although not framed as such, what plaintiff actually wants is review of the Appeals Council's determination that his additional evidence did not show a reasonable probability of changing the outcome of the ALJ's decision.  Whether that review is available depends on the reason the Appeals Council gave for rejecting the evidence:

> If the Appeals Council rejected the evidence because it was not material, as required by 20 C. F. R. § 404.970, the court may review that conclusion de novo. Stepp v. Colvin, 795 F.3d 711, 722, 725 (7th Cir. 2015). To determine whether the evidence is material, the court asks whether the evidence "creates a reasonable probability that the Commissioner would have reached a different conclusion had the evidence been considered." Id. at 725 (internal quotation marks omitted).  On the other hand, if the Appeals Council concluded that the evidence was material but that the record, supplemented by the new evidence, wouldn't show that the ALJ's decision was contrary to the weight of the evidence, the conclusion is unreviewable. Id. at 722.

Sorensen v. Saul, No. 20-CV-321-JDP, 2021 WL 805569, at *1 (W.D. Wis. Mar. 3, 2021).

Although these rules seem plain enough, they can be challenging to apply given the redundant nature of the commissioner's regulation and the Appeals Council's tendency to use perfunctory or conclusory language in its decisions.  Here, for example, as in Sorensen

and other cases, the Appeals Council said that plaintiff's new evidence "does not show a reasonable probability that it would change the outcome of the decision." Courts in this circuit have reached differing conclusions in deciding whether this or similar language allows review. See Musonera v. Saul, 410 F. Supp. 3d 1055, 1060–61 (E.D. Wis. 2019) (collecting cases). Regardless, I find it unnecessary to decide that question. Even assuming the Appeals Council's decision is reviewable, I am not persuaded that the council erred in declining review.

Although plaintiff submitted 70 pages of medical records to the Appeals Council, the only record that he discusses in his brief is his November 9, 2020 assessment with Dr. Salem, a neurologist. Plaintiff argues that Dr. Salem's determination that his neuropathy and impaired gait were likely caused by a hereditary condition "cuts against the ALJ's finding all of his symptoms appeared related to [medication] overuse." Plt.'s Br., dkt. #18, at 19. As noted previously, however, the ALJ did not reject plaintiff's asserted need for a cane solely because some doctors attributed his gait problems to overmedication but cited multiple other reasons, including plaintiff's noncompliance and his normal gait during multiple examinations, including Dr. Pond's examination in June 2020. Moreover, the ALJ recognized that plaintiff's EMG study had confirmed he had a neuropathy. AR 102. Finally, Dr. Salem did not offer any opinion about plaintiff's limitations or state that a cane was medically necessary. Accordingly, the Appeals Council did not err in finding that plaintiff's new evidence was not material or in declining to review his claim.

ORDER

IT IS ORDERED that the decision of Kilolo Kijakazi, Acting Commissioner of Social

Security, denying plaintiff's application for Disability Insurance Benefits and Supplemental

Security Income, is AFFIRMED.

Entered this 10th day of February, 2022.

BY THE COURT:

/s/

_____
BARBARA B. CRABB
District Judge

27